UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 23-CR-00415 (CRC) |
| AHMIR MERRELL, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence Mr. Ahmir Merrell to a period of **thirty months** of incarceration followed by **three years** of supervised release. The government is also seeking forfeiture of the following items recovered by law enforcement from the arrest of Defendant Merrell on November 7, 2023: a Diamondback Arms AR-Style Pistol, model DB-15, serial number: DB1565561, seventy-eight rounds of .223 caliber ammunition, and two 30 round high-capacity magazines. Defendant Merrell's decision to bring an AR-Style Pistol with over 70 rounds of ammunition in high-capacity magazines to the U.S. Capitol grounds created a manifest danger to the public, justifying a sentence at the high-end of the guideline range.

### FACTUAL AND PROCEDURAL BACKGROUND

Mr. Merrell is before this Court having pled guilty without a plea agreement to one count of Illegal Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. § 922(n), for his conduct that occurred at the Upper Senate Park in Washington, D.C. on November 7, 2023.

On Tuesday, November 7, 2023, at approximately 12:40 p.m., an officer of the United States Capitol Police (USCP), on a foot patrol in the Upper Senate Park was approached by an unidentified citizen (Witness-1). Upper Senate Park is between Union Station and the U.S. Capitol as depicted in Figure 1 below.



*Figure 1, Map Showing Location of Senate Park in Washington, D.C.*

Witness-1 stated that while walking through Lower Senate Park, he observed a black male that was holding something by his side, but Witness-1 was unsure what it was. Witness-1 expressed concern with the man's actions and stated the man seemed fidgety, uneasy and that he might be in possession of a gun. Later, a surveillance video image of Defendant Merrell's appearance holding what was later identified as a firearm in his left hand, is depicted in Figure 2.



*Figure 2, Still of Video Image of Merrill, Holding Weapon (in Yellow Circle)*

As Witness-1 was talking to the USCP officer, he pointed out the individual, a male in tan clothing who was sitting on a bench located near the center of Lower Senate Park and stated "That's him right there." The USCP officer approached the individual, later identified as the defendant, while he was sitting on a park bench.

The defendant was wearing a tan tracksuit and was clenching an item in his right hand. As the officer got closer, he observed Merrell holding the end of what appeared to be a black in color AR-style firearm with a magazine inserted into the gun and the barrel pointing toward the bench. The USCP officer drew his firearm and ordered Defendant Merrell to step away from the AR-style firearm. Merrell refused to comply and said words to the effect of "For you to get this gun from me, you are going to have to kill me."

The situation tense, the officer radioed for additional law enforcement assistance. Merrell proceeded to stand up and hold the rifle in his right hand. Merrell pointed the barrel of the rifle towards the bench. The USCP officer continued to yell commands to drop the weapon. At this

3

point, another USCP officer arrived, while the defendant proceeded to walk eastbound in the park towards Delaware Avenue, Northeast, refusing to comply with the officer's commands. At this point the Defendant appeared to raise the Rifle higher in the air but maintained the barrel towards the ground.

The newly arrived officer was able to holster his firearm and draw his Taser. The second officer yelled "Taser" and deployed it, striking the defendant in the back. Merrell dropped the AR style firearm which fell to his left side, and he fell to the ground. By this point, a large police response had arrived and multiple USCP officers subdued the defendant and placed him in hand cuffs. They secured the firearm. At this time, Merrell said words to the effect of "why didn't you shoot me, you should have killed me."

The firearm possessed by Merrell was a Diamondback Arms AR-Style Pistol, model DB-15 bearing serial number DB1565561, as depicted in Figure 3. The firearm was loaded with a .223 caliber round in the chamber. Inserted into the AR-Style Pistol was a 30-round high-capacity ammunition feeding device containing 26 rounds, as depicted in Figure 4. An additional large capacity feeding device was recovered on scene that contained 30 additional rounds. A total of 78 ammunition rounds were recovered.



*Figure 3, Diamondback Arms AR-Style Pistol Possessed by Merrell*



*Figure 4, 30-Round High-Capacity Ammunition Possessed by Merrell*

Law enforcement investigated Mr. Merrell and his background. Court records indicate that in the Superior Court of Fulton County, Georgia, case 20-SC-174488, Merrell was charged with Second Degree Cruelty to Children, and pled guilty under the Georgia First Offender Act. In that case, he has an active warrant indicating he was a fugitive from his Georgia state probation.

On April 23, 2024, Mr. Merrell pled guilty to possessing the AR-15 firearm while under indictment for a crime punishable by imprisonment for a term exceeding one year. He also

admitted shipping the firearm in interstate commerce to from Georgia to Washington, D.C. *See* ECF No. 19 at 3 "Statement of Offense." As of the date of this filing, sentencing is scheduled for August 8, 2024.

## DISCUSSION AND RECOMMENDATION

### I.   Generally Applicable Legal Principles

Though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515

>U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Commentary, Background

## II. Defendant's Sentencing Guidelines Calculation

### A. Defendant's Criminal History Category

The government concurs with the United States Probation's assessment of the Defendant's criminal history score, as set forth in the Presentence Investigation Report ("PSIR"). ECF No. 24 at page 7. The total criminal history score is 1, placing Mr. Merrell in criminal history category I. *Id.*

### B. Total Offense Level

The government also concurs with the United States Probation's assessment of the Offense Level Computation set forth in the PSIR. *Id.* at 5. The base offense level under U.S.S.G. § 2K2.1(a)(4)(B) is 20 because the offense involved a firearm that had a large capacity magazine. There are no specific offense characteristics, victim related adjustments, or adjustments for role in the offense that apply in this case. *Id.* The government has no information to suggest that the defendant obstructed justice in any way during this offense.

While there was no plea agreement in this case, the government agrees that the defendant is entitled for three points for his timely acceptance of responsibility under U.S.S.G. §3E1.1(a) and (b). The defendant is not entitled to an adjustment under U.S.S.G. §4C1.1 as a zero-point offender because the defendant received criminal history points and possessed a firearm. U.S.S.G. § 4C1.1(a)(1) and (7). Thus, the total offense level is 17. With the criminal history category of I, the guideline imprisonment range is 24 to 30 months.

7

**III.     Sentencing Recommendation**

When determining the appropriate sentence, the District Court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense; (2) The history and characteristics of the defendant; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

   A. **Nature and Circumstances of the Offense**

The nature of this offense is serious and warrants the government's requested sentence of thirty months followed by three years of supervised release. Beyond merely possessing or transporting a firearm, the Defendant did so under circumstances that presented a very real and significant risk of injury to himself and to the public at large. Not only did Defendant Merrell possess an AR machine pistol with a large capacity magazine, but he also had a total of 78 rounds. On top of this, he carried the weapon openly in his left hand while walking. While the barrel of the firearm appears to be pointed at the ground in surveillance video, it was loaded with a bullet in the chamber. This means, in effect, it would take mere moments for him to have raised the firearm, moved the safety switch with his thumb to fire, and used a finger to squeeze the trigger, firing off a bullet. Not only did Merrell possess this loaded, ready to fire high-capacity magazine, he did so in a highly populated area, near both the U.S. Capitol, Union Station, and he did so on a Tuesday

8

at lunchtime. It is hard to underscore how dangerous this situation is and how fortunate it ended as it did, with the defendant safely in custody and without a member of the public or law enforcement injured.

It is easy to see how this could have gone different, with a much more tragic end. The Defendant's statements on scene illustrate this. When the Capitol Police officers ordered the defendant to drop the firearm, he refused and replied with words to the effect of "For you to get this gun from me, you are going to have to kill me." While the government cannot conclusively paint the defendant's intent or state of mind based on this one comment, one plausible explanation is that he was trying to provoke the police into shooting him. Instead of that, the USCP officers responding to the scene were able to use non-lethal force in the form of a taser to disarm the defendant and render the situation safe. However, had the situation gone the other way, any discharge of a firearm could have resulted in the defendant suffering serious bodily injury or death. Moreover, it is not hard to see how a member of the public or another law enforcement officer could suffer serious bodily injury or death had there been a discharge of a firearm in Senate Park.

Beyond the technical act of receiving the firearm and ammunition in Georgia, and shipping and transporting those items to Washington, D.C. while under indictment, the defendant created a serious risk to himself, the public, and law enforcement. The facts are clear: The loaded firearm, ready with a round chambered. Possessing 78 rounds of ammunition with a high-capacity magazine. Traveling from Georgia to Washington, D.C. to the very situs of the nation's capital. Choosing the time, just after 12:40 p.m. Choosing a November workday, where members of the public would be walking the area. For all of these facts, it is important to note that the defendant made these choices. They show the dangerousness of his decisions. These facts serve to justify the government's call for a sentence at the high-end of the guidelines range.

### B. The History and Characteristics of the Defendant

Defendant Merrell, age 22, has only one criminal history point, that is Georgia state Case No. 20-SC-174488, outlined in the PSIR at page 6.  The specific conduct involved causing a child under the age of 18, cruel, mental, and excessive pain. While the defendant was sentenced under the Georgia First Offender Act, he also appears not to be in compliance with the terms of his probation in that case. There is a detainer on his person for a probation violation warrant. At the conclusion of any sentence in this case, he presumably will be transported to Georgia. There, he could also loose the benefit of his sentencing under the Georgia First Offender Act. In this way, Defendant Merrell has already demonstrated his failure to abide by court conditions related to his supervision. He received the benefit of the leniency of an alternative disposition in his Georgia case, only to transport the firearm and ammunition to Washington, D.C. and to be arrested in this case.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct

The government recommends to this Court a sentence of thirty months of incarceration, followed by three years of supervised release. As noted in the PSIR, for 707 defendants sentenced to imprisonment under U.S.S.G. §2K2.1 with a Criminal History Category I and a total offense level of 17, the average sentence was 21 months, and the median length was 24. *Id*. at 17. The Government contends, where the defendant not only transported and possessed this firearm but did so near the U.S. Capitol on a busy afternoon and in such a dangerous manner as outlined above, is justification for placing this case on the higher end of the 24 month to 30 month guideline range.

### D. The Need for the Sentenced Imposed

The government contends that a sentence of thirty months followed by three years of supervised release is an appropriate sentence in this matter.  Mr. Merrell's conduct was dangerous

10

and placed himself, the public, and law enforcement at risk. Both to deter Mr. Merrell and others from contemplating a similar action involving the U.S. Capitol grounds, a sentence at the high end of the guideline range is necessary. Further, this sentence is necessary to protect the public from someone whose decision making and mental and emotional condition created such a dangerous situation. Mr. Merrell unfortunately has also shown through his actions that a lengthy period of supervision is required after he serves his period of incarceration due to his demonstrated inability to comply with previous terms of supervision.

On a final note, this thirty-month sentence also provides the ability for Mr. Merrell to take advantage of programming in the Bureau of Prisons. As noted in the PSIR, Mr. Merrell has time to take advantage of the Bureau Literacy Program, the Federal Prisons Industries Program, and the Occupational Education Program, and the Drug Abuse Education Program. *Id.* at 12-13. These programs can provide the defendant an opportunity for gainful and lawful employment once his term of incarceration ends and he is released on supervision.

## CONCLUSION

For all these reasons, the government recommends that the Court sentence the Defendant to thirty months of incarceration to be followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:   */s/ Alexander R. Schneider*
Alexander R. Schneider
Michigan Bar No. P71467
Special Assistant United States Attorney
601 D Street, N.W.

Washington, D.C. 20530
alexander.schneider@usdoj.gov
(202) 252-7124

12