UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>AHMIR MERRELL,<br><br>          Defendant. | Crim. Action No. 1:23CR415 |

**MEMORANDUM IN AID OF SENTENCING**

    Ahmir Merrell comes before the Court to be sentenced for unlawfully possessing a firearm. The facts of this case and the guidelines range calculated by the Pre-Sentence Report are not in dispute. Straightforward as this case may appear at first blush, however, in many ways this is a unique gun possession case. The facts and circumstances clearly show that Mr. Merrell did not possess a firearm in order to commit any other crimes. He did not possess it to threaten or harm anyone. Tragically, the only person he wanted to harm that day was himself. As described below and in the attached report by Dr. Stephen Lally, Mr. Merrell's offense—walking down the street with a pistol pointed towards the ground and inviting the police to shoot him—was a cry for help, not an attempt to hurt anyone else. Now clear-minded, Mr. Merrell knows that he needs mental health treatment and therapy. He welcomes the opportunity to benefit from mental health treatment pursuant to his supervised release.

Counsel has reviewed the Pre-Sentence Report and offers no objection to the guidelines range of 24 to 30 months. The government does not dispute this guidelines range either. It is worth noting that, previously, the government agreed that if Mr. Merrell pleaded guilty, it would recommend a sentence at the midpoint of the guideline range. Now, the government has recommended a sentence at the high-end, based apparently on Mr. Merrell's election to plead guilty to the Indictment without an agreement. No new facts or change of circumstance have emerged that would warrant the government's change in recommendation. And indeed, Mr. Merrell has accepted responsibility just as he would have pursuant to a plea agreement. The government's prior recognition that a sentence at the mid-point of the range would be appropriate calls into question the reasonableness behind its current request.

In any event, the defense submits that this is not a case well-suited to the formulaic approach to the Guidelines, which the law recognizes are not presumed to be reasonable and must be evaluated in light of the goals of sentencing. *See, e.g., Kimbrough v. United States*, 552 U.S. 85 (2007). In Mr. Merrell's case, the sentence should reflect Mr. Merrell's troubled upbringing, struggles with apparently inherited mental illness, and his commitment to safely managing his illness. A sentence of 12 months and one day followed by intensive supervision, including a mental health component, is sufficient but no greater than necessary to achieve the goals of sentencing.

**I. The § 3553(a) sentencing factors support a sentence of no more than 12 months and one day.**

The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). In Mr. Merrell's case, the sentencing factors enumerated in § 3553(a) support a sentence of no more than 12 months and one day.

> **a. Mr. Merrell's history and characteristics—marked by parental neglect and abuse and emerging mental health issues—militate in favor a below-guidelines sentence and treatment**.

Ahmir Merrell was born in Atlanta in 2002. His parents separated shortly before he was born. He and his three maternal brothers lived with their mother in Atlanta until Ahmir was about four years old, when his mother moved the young family to Washington, D.C. to be closer to family. Ahmir attended elementary school in D.C. His mother struggled to provide for Ahmir and his brothers. Ahmir recalls that she worked at a car rental shop and at Amazon.

When Ahmir was 13 years old, his mother moved the boys back to Atlanta. Soon after they arrived back in Atlanta, it appears Ahmir's mother had a mental breakdown and suddenly left the children. She did not return for 7 years. In Ahmir's words, "she disappeared." Ahmir was still a teenager and did not understand why his mother suddenly left. He recalls that his mother told him that she needed a break. To this day, he does not know exactly where she went, though he believes she lived in the woods in some type of "encampment." The sudden absence of his mother during a critical point in his development impacted Ahmir in myriad ways. He worried about

3

her constantly and wondered if it was his fault that she needed a break. Though the boys' lives had been unstable, he never questioned that his mother loved him. When she left, he wondered if he had imagined her love.

When his mother left, Ahmir was forced to move in with his father, stepmother, and two stepsisters. Ahmir had only sporadic contact with his father through the years. Their relationship was fraught. His father and stepmother did not welcome Ahmir, who by then was a troubled teenager. With the addition of Ahmir and his two brothers, the house was crowded and chaotic. When Ahmir acted up, his father responded by hitting and punching him. Sometimes, his father would take the extra step of donning boxing gloves to beat him. Perhaps even worse, his father would tell Ahmir that he was a "mistake." Meanwhile, his stepmother also abused him; she often joined in on punching him and telling him that he was trouble, worthless, and would not amount to anything.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████,
███████████████████████████

Undersigned counsel spoke to Ahmir's paternal grandmother who corroborated his accounts of abuse at the hands of his father. His grandmother believes that Ahmir wanted to escape his father's home and acted out so that he would be removed. In the

4

aftermath still today, he feels intense remorse over his conduct—so much so that his guilt has driven him to want to take his own life.

Following his arrest, Ahmir was placed at Evolution Group Home pursuant to the Georgia state court case. Fortunately for Ahmir, Shona Shaw, whose letter is attached, was assigned to be Ahmir's case manager. Ms. Shaw was the first stable, constant adult presence Ahmir ever knew aside from his mother before her breakdown. Ahmir opened up to Shona about the traumas he experienced. She gently pushed him to apply for various jobs and to study for his GED. Under Ms. Shaw's guidance, Ahmir worked as a custodian, in a restaurant, and as a mover. Slowly, he began to blossom, though he continued to suffer from depression and guilt. In her letter to the Court, Ms. Shaw writes of Ahmir's time at the shelter, observing that

> He [Ahmir] was always helpful around the shelter and willing to attend any groups or workshops we offered. He was eager to learn, to be an adult and have his own space and would always listen to the advice given.

Letter of Shona Shaw at 1, Exhibit 1.

In August 2023, Ahmir had to leave the group home due to conflict he had with his brother, who also resided there. The conflict arose when Ahmir learned that his brother had used Ahmir's social security number to open lines of credit. The two fought bitterly and could not live in the same place, understandably. Ahmir was basically homeless after leaving the shelter. He began smoking marijuana. According to Shona, the drugs instigated a mental health crisis. After a few months, Ahmir decided he would move to Washington, D.C. Shona helped him purchase a bus ticket.

Before he left, Ahmir told Shona that he felt he needed a gun for protection. Shona, for her part, did not believe that he would bring a gun to D.C.

> **b. The nature and circumstances of the offense show that Mr. Merrell did not intend to hurt anyone; his offense conduct was a clear cry for help**.

Ahmir's depression and paranoia deepened during the long bus ride from Atlanta to D.C. When he arrived in D.C., he was in the throes of a mental health crisis and alone. Dr. Lally recounts that when someone asked him for a lighter, he thought the person was trying to kill him. Not knowing what to do, Ahmir took the firearm he had obtained shortly before he left out and held it openly, knowing that the police would respond. Of course, thankfully, the police did respond. When police approached, Ahmir held the gun pointed towards the ground. When officers ordered Mr. Merrell to drop the gun, he responded, "for you to get this gun from me, you are going to have to kill me." Officers thereafter tased Ahmir and easily took him into custody. After he was in custody, Ahmir told the police, "you should have killed me." Lally Report at 2, Exhibit 2.

When Shona heard of Ahmir's arrest, she knew that it had been a suicide attempt. Later, she spoke to him while he was the jail and he privately expressed remorse and confirmed that he never intended to hurt anyone. *See* Letter of Shona Shaw at 2, Exhibit 1.

> **i. Mr. Merrell's mental state has improved since** ▮▮▮▮

When Mr. Merrell was admitted to the jail, ▮▮▮▮

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████[1]

███████████████████████████████████████

██████████████████████████████████████████████████

████ By March 2024, the D.C. Jail records as well as counsel's observations show that he was doing much better.

██████████████████████████████████████████████

████



██████████████████████████████████████████

██████████████████

██████████████████████████████████████████

███████████████████████████████████████. He is committed to doing so going forward. When he has completed his sentence in this case, he intends to return to Georgia to turn himself in on the pending Georgia matter.

### c. The requested sentence will avoid unwarranted sentencing disparities.

Over the last five years, courts have been increasingly imposing below-guidelines sentences in firearm cases.[2] A review of recently resolved 922(g) cases in this district demonstrate that the requested sentence will be in line with other recently resolved gun possession cases. In *United States v. Simmons*, 19-cr-409 (KBJ), for example, the Court varied downward and sentenced the defendant to time-served in a 922(g) case where the guideline range was 12 to 18 months. In *United States v. Juamal Carroll*, 19-cr-407 (ABJ), the defendant was sentenced to 18 months, where the guidelines range was 30 to 37 months, concurrent to an expected nine-month sentence for violation of supervised release. And in *United States v. Christopher Carroll*, 20-cr-16 (JEB), the Court also varied downward and sentenced the defendant to one year and one day where the guideline range was 30 to 37 months. In another

---

[2] *See Quick Facts: 18 U.S.C. § 922(g) Firearms Offenses*, U.S. SENT'G COMM'N (2022), https://www.ussc.gov/research/quick-facts/section-922g-firearms.

case involving a guideline range of 30 to 37 months, the Court imposed a sentence of 14 months. *See United States v. Antone Watkins*, 20-cr-19 (CRC).

District judges have likewise varied downward in cases in which defendants had significant records, more serious than Mr. Merrell's. In *United States v. Norris*, 22-cr-35 (TFH), for example, the defendant was on supervision for manslaughter and was arrested with a firearm. The district judge imposed a sentence of 18 months, notwithstanding a guideline range of 30 to 37 months. In *United States v. Javon Hensen*, 20-cr-138 (RBW), the defendant had three prior firearms offenses, resulting in a guideline range of 46 to 57 months. In that case, the government agreed to recommend 34 months and this Court imposed a sentence of 34 months. In another case, the district judge sentenced a defendant to 36 months incarceration when the applicable guideline range was 46 to 57 months. *See United States v. Malik Wilkins*, 19-cr-245 (TFH) (defendant had criminal history and committed instant offense while on supervision). Lastly, a district judge imposed a below-guidelines sentence where the defendant was arrested for gun possession and multiple guns and ammunition were recovered from the defendant's home and where the defendant had a prior conviction for attempted first-degree murder for which he had served 15 years. *United States v. Williams*, 20-cr-37 (DLF) (30 months imposed though applicable guideline range was 41 to 51 months).

> **d. A sentence of 12 months and one day in addition to the collateral consequences Mr. Merrell will experience will reflect the basic aims of sentencing**.

When a defendant suffers consequences for his criminal conduct—apart from the sentence imposed through the criminal court process—the sentencing court can take this collateral punishment into account in fashioning a sentence. *See e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007); *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) (recognizing that the effects of collateral consequences can be "devastating" and that myriad rules effectively prevent an ex-offender's "reintegration into the mainstream society and economy").

In Mr. Merrell's case, the impact of the instant conviction is severe. While he was under indictment when he possessed the firearm, his Georgia conviction would have been set aside had he successfully completed probation. He committed the instant offense while he was on probation, meaning that his Georgia conviction will stand and he will have additional felony conviction for the instant offense. These two convictions will certainly impact Mr. Merrell's ability to obtain certain types of employment.

With respect to rehabilitation, Mr. Merrell has begun the path to complete rehabilitation ███████████████████████████████████████████████████████████████████████████████████████. Given the unique facts of this case, counsel respectfully suggests that the most impactful deterrent for Mr. Merrell will be his continuing engagement with mental health treatment. A sentence of 12 months and one day would provide more than adequate deterrence to those few individuals who might be similarly situated to him.

Finally, a sentence of twelve months and one day would constitute a just punishment in this unique case. Mr. Merrell did not want to hurt anyone. He was not using the firearm to commit crimes. He was in the throes of a mental health crisis and only attempting to hurt himself. To the extent punishment is even needed in this case, 12 months and one day will fairly punish Mr. Merrell's sad, desperate conduct.

## Conclusion

For the reasons herein, the attached exhibits, and the record in this case, a sentence of 12 months and one day followed by supervision and mental health treatment is more than sufficient to meet the goals of sentencing.

Respectfully submitted,

A. J. Kramer
Federal Public Defender

_____/s/_____
Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004
(202) 208-7500